## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES GRAHAM, Individually And On Behalf Of All Others Similarly Situated,

Plaintiff,

v.

TIM E. BENTSEN, CHARLES A. BLIXT, LYNN CRUMP-CAINE, CARL E. LEE, JR., C. STEPHEN LYNN, ROBERT S. MCCOY, JR., JAMES H. MORGAN, ANDREW J. SCHIDLER, LIZANNE THOMAS, ANTHONY N. THOMPSON, and KRISPY KREME DOUGHNUTS INC.,

Defendants.

C.A. No. _____

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

James Graham ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his own acts, which is alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.     This is a shareholder class action brought by Plaintiff on behalf of holders of the common stock of Krispy Kreme Doughnuts, Inc. ("Krispy Kreme" or the "Company") against the Company and its board of directors (the "Board") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder in connection with the proposed acquisition of Krispy Kreme by the private Dutch company JAB Holdings B.V. through its Delaware company Cotton Parent, Inc. ("Parent") and

the North Carolina corporation, Cotton Merger Sub, Inc., through a merger, as detailed herein (the "Proposed Transaction").[1]

2. On May 8, 2016, Krispy Kreme and JAB jointly announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") whereby Krispy Kreme will merge with and into Merger Sub (the "Merger"), with Krispy Kreme surviving as a wholly-owned subsidiary of Parent. The Merger was unanimously approved and adopted by the Board of Directors of Krispy Kreme. Pursuant to the Merger, each issued and outstanding share of Krispy Kreme common stock will be cancelled and automatically converted into the right to receive $21.00 in cash ("Merger Consideration").

3. Defendants (defined below) violated the above-referenced sections of the Exchange Act, and rules and regulations promulgated by the U.S. Securities and Exchange Commission ("SEC"), by filing a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "14A") with the SEC on May 31, 2016. The 14A recommends that Krispy Kreme shareholders exchange their shares pursuant to the terms of the Merger Agreement based among other things on the opinion rendered by the Company's financial advisor, Wells Fargo Securities, LLC ("Wells Fargo") and other internal and external factors the Krispy Kreme Board purportedly considered to make the recommendation.

4. The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Krispy Kreme's public shareholders. The Company has consistently announced positive financial results in recent quarters and its stock price has since the beginning of the year risen approximately 20%. The

---

[1] The acquisition will be made utilizing JAB Beech, Inc. an affiliate of JAB in which the U.S. private equity firm BDT Capital partners is a shareholder.

positive results continued into the first quarter for fiscal 2017, when the Company announced that its revenues increased 3% and earnings per share increased to $0.25 per share beating consensus estimates of $0.24 per share. Analysts are expecting the Company to grow its earnings at an average annual rate of 20% over the next five years.[2]

5.  In February 2016, analysts had given the Company's stock a price target of $23.00 per share.[3] Thus, the Merger Consideration is inadequate and does not reflect the value of the Company or the fair value of Krispy Kreme stock.

6.  The inadequate Merger Consideration appears to be the result of the efforts of certain Krispy Kreme insiders motivated by the prospect of potentially cashing out illiquid equity holdings (including stock options and restricted stock units) to reap immediate, if inadequate, benefits.

7.  Moreover, directors, executive officers and certain shareholders who own greater than 5% of the Company's outstanding common stock in the aggregate beneficially own nearly 5.5% of the outstanding Krispy Kreme shares and therefore can influence the approval of the Merger. Moreover, Wells Fargo & Company and its subsidiaries, affiliate or parent of Krispy Kreme's financial advisor for the Proposed Transaction, Wells Fargo Securities, LLC ("Wells Fargo) owns nearly 8% of the Company's outstanding shares.[4]

8.  Further, certain Company officers and/or Board members on information and belief will keep their lucrative management positions after the Proposed Transaction closes, and certain of these officers and/or Board members may have been involved in the strategic review process

---

[2] www.nasdaq.com/symbol/kkd/earnings-growth.
[3] www.themarketsdaily.com/analyst-actions/stock-price-target-for-krispy-kreme-doughnuts-inc-nysekkd/121195.
[4]www.sec.gov/Archives/edgar/data/1100270/000120677415001624/krispykreme_def14a.htm#dirnom.

3

and present at various Board meetings during which the Company's strategic alternatives, including the Proposed Transaction, were discussed, and thus undoubtedly influenced the Board's decision making process.

9.      To ensure the success of the Proposed Transaction, the Krispy Kreme Board of Directors (the "Board") locked up the deal by agreeing to impermissible "deal-protection" devices, effectively rendering the Proposed Transaction a *fait accompli*.  For example, the Board agreed to: (i) a "no-shop" provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (ii) a provision mandating that the Company must inform JAB before taking action on any superior proposal from another potential acquirer, and requiring that the Board provide all information relating to the superior proposal (including the terms and identity of the suitor); and (iii) a $42 million termination fee to be paid to JAB if the Board agrees to a competing superior proposal.

10.      In pursuing the plan to facilitate JAB's acquisition of Krispy Kreme for grossly inadequate consideration, through a flawed process, the Defendants violated Sections 14(a) and 20(a) of the Exchange Act by causing the materially incomplete and misleading Proxy to be filed with the SEC on May 31, 2016.  The Proxy recommends that Krispy Kreme shareholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information which renders the Proxy misleading.

11.      Specifically, the Proxy contains materially incomplete and misleading information concerning (i) the background of the Proposed Transaction; (ii) the Company's internal financial data forecasts; and (iii) the financial analyses of the Proposed Transaction performed by Wells Fargo.

4

12.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. 17 C.F.R. § 240.14a-9.

14.     The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Krispy Kreme maintains its primary place of business in this District.

## THE PARTIES

16.     Plaintiff is, and at all relevant times was a shareholder of Defendant Krispy Kreme since prior to the wrongs complained of herein.

17.     Krispy Kreme Doughnuts, Inc. is a corporation organized and existing under the laws of North Carolina, with its principal executive offices located at 370 Knollwood Street, Winston-Salem, North Carolina 27103. The Company is a branded specialty retailer and wholesaler of sweet treats and complementary products, known mostly for its signature Original Glazed® doughnuts. The Company also sells coffee products. It has been in business since 1937 and trades on the New York Stock Exchange under the symbol "KKD."

18.     Defendant Tim E. Bentsen has been a director of Krispy Kreme since 2014 and also a director of the financial services company Synovus Financial Corp. since 2014.

19.     Defendant Charles A. Blixt has been a director of Krispy Kreme since 2007.

20.     Defendant Lynn Crump-Caine has been a director of Krispy Kreme since 2007.

21.     Defendant Carl E. Lee, Jr. has been a director of Krispy Kreme since 2014.

22.     Defendant C. Stephen Lynn has been a director of Krispy Kreme since 2007. He also founded and is a managing partner of RP3, LLC, a consulting and mergers and acquisition firm focusing on franchising and restaurant chains. From 2009 to August 2012, Mr. Lynn was Chairman of the Board of Directors of BBAC, LLC, an investment partnership.

23.     Defendant Robert S. McCoy, Jr. has been a director of Krispy Kreme since 2003.

24.     Defendant James H. Morgan has been a director of Krispy Kreme since 2000 and has served as chairman of the board since 2005. He served as CEO of the Company from 2008 to June 2014, president from 2008 to November 2011 and from April 2012 to June 2014. Morgan served as chairman of Covenant Capital, LLC, an investment management firm, from 2001 to 2008, chairman and CEO of Wachovia Securities, Inc. from April to December 1999, and worked at Interstate/Johnson Lane, an investment banking and brokerage firm, from 1990 to 1999 in various capacities, including as Chairman and CEO.

25.     Defendant Andrew J. Schidler has been a director of Krispy Kreme since 2006.

26.     Defendant Lizanne Thomas has been a director of Krispy Kreme since 2004 and is a partner at the law firm, Jones Day, heading the firm's corporate governance team

27.     Defendant Anthony N. Thompson is Krispy Kreme's president and CEO and has been a director of the Company since 2014

6

28. The Defendants above are collectively referred to hereinafter as the "Individual Defendants."

29. Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

30. Collectively, the Individual Defendants, Krispy Kreme are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

31. Plaintiff bring this action on his own behalf and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on behalf of all holders of Krispy Kreme common stock who are holders of record and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

32. This action is properly maintainable as a class action because:

    (a) The Class is so numerous that joinder of all members is impracticable. As of March 18, 2016 Krispy Kreme had outstanding approximately 63,184,555 shares of Common Stock. Class members are believed to be geographically dispersed.

    (b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate

7

representative of the Class and will fairly and adequately protect the interests of the Class;

(c)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(d)     To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

33.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

8

**A.**    **Background**

34.    Krispy Kreme describes itself as "a leading branded retailer and wholesaler of high-quality doughnuts, complementary beverages and treats and packaged sweets. The Company's principal business, which began in 1937, is owning and franchising Krispy Kreme stores, at which a wide variety of high-quality doughnuts, including the Company's Original Glazed® doughnut, are sold and distributed together with complementary products, and where a broad array of coffees and other beverages are offered." *See* Form 10-K for fiscal 2015.[5]

35.    The Company generates revenues from four business segments: Company Stores, Domestic Franchise, International Franchise and KK Supply Chain. The Company Stores segment is comprised of the doughnut shops operated by the Company. These shops sell doughnuts and complementary products through the on-premises and wholesale channels and come in two formats: factory stores and satellite shops. Factory stores have a doughnut-making production line, and many of them sell products to on-premises consumers and at wholesale to approved retailers of Krispy Kreme products to more fully utilize production capacity. Factory stores also include commissaries which serve only wholesale customers. Satellite shops, which serve only on-premises customers, are smaller than most factory stores, and include the hot shop and fresh shop formats. As of February 1, 2015, there were 111 Company shops in 19 states and the District of Columbia, including 92 factory and 19 satellite shops. *Id.*

36.    The Domestic Franchise segment consists of the Company's domestic store franchise operations and the licensing of Krispy Kreme products domestically. Domestic franchise

---

[5] www.sec.gov/Archives/edgar/data/1100270/000120677415001119/krispykreme_10k.htm#a_00 3.

stores sell doughnuts and complementary products through the on-premises and wholesale channels in the same way and using the same store formats as do Company stores. As of February 1, 2015, there were 167 domestic franchise stores in 32 states, consisting of 116 factory and 51 satellite stores. *Id.*

37.     The Company began licensing complementary products in the beverage category when it signed an agreement for the test of Krispy Kreme branded bagged coffee at approximately 100 wholesale club locations in the southeastern United States. In calendar 2014, the Company signed agreements for the introduction of Krispy Kreme branded ready-to-drink coffee beverages in bottles for distribution at approximately 900 mass merchant locations throughout the United States, and an agreement with Keurig Green Mountain to bring Krispy Kreme branded coffee to the Keurig® brewing system. Krispy Kreme coffee is available in K-Cup® packs at grocery, convenience store and big box outlets throughout the U.S., as well as at Krispy Kreme shops and online. Manufacturing and distribution of all three products is done by the licensees. In March 2015, the Company announced a multi-year licensing agreement with a major beverage firm to roast and distribute twelve-ounce bags of Krispy Kreme® ground coffee in Rich, Smooth and Decaf blends through grocers, mass merchants, club stores and online. The Company intends to expand licensing of its brand to additional beverages and other product categories.[6]

38.     The International Franchise segment consists of the Company's international store franchise operations. International franchise stores sell doughnuts and complementary products almost exclusively through the on-premises sales channel using shop formats similar to those used in the United States, and also using a kiosk format. A portion of sales by the franchisees in Canada,

---

[6] As mentioned in the Proxy, JAB acquired Keurig while it was negotiating the acquisition of Krispy Kreme.

the United Kingdom and Australia are made at wholesale to approved retailers of Krispy Kreme products. As of February 1, 2015, there were 709 international franchise shops in 23 countries, consisting of 133 factory stores and 576 satellite shops. *Id.*

39. The KK Supply Chain segment produces doughnut mixes and manufactures doughnut-making equipment, which all factory stores, both Company and franchise, are required to purchase. In addition, KK Supply Chain sells other ingredients, packaging and supplies, principally to Company-owned and domestic franchise stores. *Id.*

40. Before announcement of the Proposed Transaction, Krispy Kreme stock had increased approximately 20% in the first half of 2016. It had reported consistently profitable earnings and was beating analysts' expectations.

**B.** **The Proposed Transaction and the Flawed "Process"**

41. On May 9, 2016, Krispy Kreme and JAB issued a joint press release announcing the Proposed Transaction which stated:

> WINSTON-SALEM, NC – May 9, 2016 – Krispy Kreme Doughnuts, Inc. (NYSE: KKD) ("Krispy Kreme" or the "Company") and JAB Beech Inc., an indirect controlled subsidiary of JAB Holding Company ("JAB") in which BDT Capital Partners is a minority investor alongside JAB, today announced that the companies have entered into a definitive merger agreement under which JAB Beech will acquire Krispy Kreme for $21 per share in cash, or a total equity value of approximately $1.35 billion. The agreement, which has been unanimously approved by Krispy Kreme's Board of Directors, represents a premium of approximately 25% over the Company's closing stock price on May 6, 2016.
>
> At the close of the transaction, Krispy Kreme will be privately owned and will continue to be independently operated from Krispy Kreme's current headquarters in Winston-Salem, N.C.
>
> Jim Morgan, Chairman of the Board of Directors of Krispy Kreme, commented, "For nearly 80 years, our iconic brand has been touching and enhancing lives through the joy that is *Krispy Kreme*. This transaction puts us in the best possible position to continue to spread that joy to a growing number of people around the world while delivering significant value to

11

Krispy Kreme shareholders. I am confident the JAB team is the right partner with whom to continue building upon our incredible legacy."

Tony Thompson, CEO of Krispy Kreme, commented, "JAB's experience and industry knowledge make them the ideal partner to help grow the iconic *Krispy Kreme* brand throughout the world. We remain focused on our long term strategy and continuing to offer our premium, high-quality doughnuts and sweet treats to consumers around the world. We look forward to working with JAB to continue bringing the joy that is *Krispy Kreme* to a growing number of customers. Together with our talented team and our passionate franchisees, we will continue to build on the Krispy Kreme culture, values and commitment to our customers and guests."

Peter Harf, Senior Partner at JAB, commented, "We are thrilled to have such an iconic brand as *Krispy Kreme* joining the JAB portfolio. This is yet another example of our commitment to investing in extraordinary brands with significant growth prospects. We feel strongly that Krispy Kreme will benefit greatly from our long-term focus and support for management's vision in building on the legacy of this exciting brand as an independent standalone entity."

Transaction Terms; Postponement of Annual Meeting
The transaction is not subject to a financing condition and is expected to close in the third quarter, subject to customary closing conditions, including receipt of regulatory and shareholder approvals.

In light of the announcement and pending transactions under the merger agreement, the Company's Board of Directors has determined to postpone the Company's 2016 Annual Meeting of Shareholders, originally scheduled for June 14, 2016. At a later date, the Company will provide information related to a rescheduled meeting, if applicable.[7]

42.    The process that led to this announced Proposed Transaction was flawed from the beginning. Indeed, there was not a process at all – the Board negotiated solely and exclusively with JAB.

43.    The Proxy describes a fundamentally flawed process in which the Board failed to contact any other entity about the sale of the Company and engaged only with JAB. The Company has filed the false and misleading Proxy to obscure and obfuscate its actions and inactions.

---

[7] www.sec.gov/Archives/edgar/data/1100270/000120677416005893/exhibit99-1.htm.

44.     In the fall of 2015, JAB initiated discussions with Krispy Kreme regarding a possible merger of the two companies. It started in September 2015, when JAB contacted Morgan about possible transactions.   Then, on October 6, 2015, Morgan met representatives of JAB to discuss a possible acquisition of the Company.  Morgan did not meet with or inform the Board, but updated certain board members of this contact with JAB, including Thompson, who became engaged in the discussions with JAB.  Proxy 27.

45.     On October 21, 2015, Thompson met personally with JAB representative to discuss Krispy Kreme's performance and JAB.  Thompson told Morgan about the meeting, but not the Board.  Proxy 27.

46.     Thompson and Morgan then personally met with JAB representatives at its offices in Washington D.C. on November 5, 2015.   JAB disclosed that it was interested acquiring the Company at $18.75 per Krispy Kreme share.  JAB also revealed that it would not engage in a multi-party process for the sale of Krispy Kreme and would not pursue an acquisition if the Company chose to engage in one.   Morgan and Thompson discussed the substance of this meeting with various Board members, including with McCoy, Jr.  Proxy 28.

47.     At a specially-called Board meeting on November 23, 2015, the Board heard about the meetings with and proposal by JAB from Morgan and Thompson.  The Board discussed this proposal and the Company's possible valuation in sales transaction.  The Board elected to obtain more updated information regarding the revised strategic plan on which Company management had been working over the past several months and to retain a financial advisor in order to assess JAB's proposal. *Id.*  Another special Board meeting was held on December 7, 2015, at which Morgan disclosed his communications with JAB regarding JAB's acquisition of Keurig Green

13

Mountain. JAB assured Morgan that the Keurig acquisition would not impact its effort to acquire Krispy Kreme. *Id.*

48.     At a regularly scheduled Board meeting on December 15 and 16, 2015, the Board continued with its discussions about the JAB proposal, which included Company management and Wells Fargo Securities, LLC ("Wells Fargo"). At these meetings, Thompson and Price Cooper, the Chief Financial Officer ("CFO") of the Company, presented an update of the financial results of the Company for the third quarter of fiscal year 2016 and also discussed management's long-term outlook for the Company. While management was still in the process of completing its long-term financial plan, management and the board reviewed and discussed the potential financial results that would result from the Company continuing to grow under its current balance between Company and franchise operations. In addition, there were discussions concerning management's belief the Company would be more successful over the long-term by transitioning to more of a franchise-based system. Proxy 29.

49.     Wells Fargo Securities discussed the current mergers and acquisitions environment generally and with respect to the quick service restaurant industry in particular and their preliminary views with respect to other parties that could potentially be interested in pursuing a strategic transaction with the Company. Among other things, Wells Fargo claimed that there were a limited number of potential strategic buyers in the quick service restaurant industry, that there had been a limited number of strategic mergers and acquisitions in the industry in recent years and that there had been a limited number of mergers and acquisitions in the quick service restaurant industry in recent years with transaction values in excess of $1 billion. In addition, Wells Fargo also claimed that, given the financial models typically employed by financial buyers in evaluating potential transactions, which require certain hurdle rates of return on investments, it was unlikely

14

that a financial buyer would be interested in making a fully financed, non-contingent offer to acquire the Company at a price per share greater than $18.75. Wells Fargo also discussed the public profile and investment philosophy of JAB. The Board rejected JAB's proposal but decided to continue engaging JAB about a possible merger. Morgan informed JAB of the substance of this Board meeting and the two parties continued discussions to the end of the year. Even though the Board rejected the JAB proposal including purportedly to engage exclusively with JAB, it did not elect to reach out to other potentially interested parties about a merger or other type of strategic transaction with the Company. The Proxy fails to disclose the basis for the Board's failure to engage in, much less even explore the possibility of, a multi-party process. Proxy 29.

50. On December 31, 2015, the Board held a special meeting and agreed to engage Wells Fargo as the Company's financial advisor. At the meeting, the Board discussed Wells Fargo prior relationships with the Company and relationships and JAB. The Proxy does not disclose the information available to the Board regarding Wells Fargo's relationships, including those of individuals from Wells Fargo who would be working with Krispy Kreme, but nonetheless, the Board voted to engage Wells Fargo regarding a possible transaction with JAB or other entities. The engagement letter with Wells Fargo was executed on December 31, 2015. *Id.*

51. Although a private equity firm contacted Thompson in January 2016 expressing an interest in the Company, and even followed up with a meeting on February 9, 2016 and February 29, 2016, Defendants failed to take any action to inform the equity firm of the valuation of the Company, contrary to the Boards supposed decision not to deal with JAB on an exclusive basis at the December 15-16, 2015 Board meeting. Proxy 30. In late January, 2016 JAB and Defendants agreed to meet in late March 2016 regarding a potential transaction to give JAB time to close its acquisition of Keurig. *Id.*

Case 1:16-cv-00612-WO-LPA   Document 1   Filed 06/13/16   Page 15 of 40

52.     At a regularly-scheduled Board meeting on March 15, 2016, the Board reviewed the status of the JAB discussions (and heard about h the equity firm's contacts) and heard from management about the Company's updated long-term strategic plan. Management discussed its financial plan with respect to the Company, including the potential short- and long-term financial impacts of the Company's base strategic initiatives, the challenging near-to-intermediate-term operating environment for the Company's strategy to shift toward a more franchise-based business model, the resulting increased refranchising in the upcoming years related to shrinking of the Company store footprint, the impact on earnings growth and earnings predictability, and the impact of such a strategy on earnings before interest, taxes, depreciation, and amortization ("EBITDA") and other financial metrics. Members of management of the Company also discussed the near term operational and financial risks associated with such a strategy to transition to a more franchise-based model and the inherent challenges with respect to operating an interrelated retail shop and consumer packaged goods platform. *Id.* The Proxy fails to disclose what other financial metrics were discussed at the March 15, 2016 Board meeting and whether those metrics were GAAP, non-GAAP or both. *Id.*

53.     On March 23, 2016, JAB toured Krispy Kreme's facilities in North Carolina with Morgan, Thompson, and Cooper and then met and discussed an increase to the JAB proposal. JAB again emphasized they it sought only bi-lateral discussions with the Company, rather than engaging in a multi-party process, and that it preferred to negotiate a transaction in a short time after entering a confidentiality agreement with Krispy Kreme to allow for due diligence. Proxy 31. Of course, the Board still as of the date of this meeting had done nothing to explore the interest of other potential bidders.  The exclusive contact with JAB continued on March 31, 2016, when JAB teased Morgan by claiming it was considering an increase to its proposal even without due

16

diligence and based only on public information, but that it would need a week at the Company's Winston Salem facility after entering a confidentiality agreement. *Id.*

54. On April 1, 2016, JAB verbally increased its proposal to $19.50 per Krispy Kreme share and alluded to another possible increase once it conducted due diligence, which could not start in any event until the week of April 25, 2016. JAB also threatened to disengage with the Company if the Company sought out other potential offers. *Id.* Again, the Board did nothing to investigate other potential entities for a possible strategic transaction.

55. On April 4, 2016, at a special Board meeting, Morgan disclosed the JAB updated offer (and presumably its threat). Wells Fargo discussed certain financial aspects of the revised offer from JAB and reiterated its view that there was a limited likelihood that a strategic buyer would be interested in pursuing a transaction with the Company. The Proxy fails to disclose the basis for this view. Wells Fargo also again expressed its view that, given the financial models typically employed by financial buyers in evaluating potential transactions, which require certain hurdle rates of return on investments, they believed it was unlikely that a financial buyer would be interested in making a fully financed, non-contingent offer to acquire the Company at a price per share greater than $19.50. The Proxy fails to disclose any information on these "financial models" and the "hurdle rates" that such financial buyers would require to be interested in a transaction with Krispy Kreme. The Board agreed to enter into a confidentiality and standstill agreement with JAB to allow it to engage in a due diligence. *Id*

56. On April 8, 2016, the Company and an affiliate of JAB executed the confidentiality and standstill agreement. Proxy 32. The Proxy fails to disclose the JAB affiliate, but presumably it is JAB Beech, Inc. the indirect controlled subsidiary of JAB in which BDT Capital Partners

17

("BDT"), a Chicago-based investment firm, is a minority investor.[8] JAB began its due diligence on April 25, 2016, and continued to allude to Morgan that it could increase its proposal further depending on the outcome of its due diligence, which could be made by May 4, 2016. Proxy 32.

57. At a Board meeting held on May 3, 2016, to discuss the JAB proposal, Wells Fargo reviewed and discussed their preliminary financial analyses with respect to the Company and the proposed transaction, its views regarding current mergers and acquisitions market generally and with respect to the quick service restaurant industry in particular (those views are not disclosed), and further discussed "information concerning other potential acquirers of the Company, the businesses and strategic activities of certain of those parties, and the likelihood that the Company would be able to generate interest from such other potential acquirers." This information is not disclosed in the Proxy. The Proxy again discloses that Wells Fargo continued to believe that it was unlikely that any financial buyers would be interested in the Company (for the same vague reasons, *i.e.,* due to some undisclosed "financial models typically employed by financial buyers in evaluating potential transactions, which require certain hurdle rates of return."). Proxy 32.

58. Krispy Kreme's management also reviewed its long-term strategic plan with respect to the Company, indicating that the strategic plan, while being the right approach for the long-term, was likely to negatively impact cash flow growth in the near term. The Proxy fails to disclose the grounds for management's views on the Company's near term cash flow prospects or the number of years for this negative cash flow. Management also purportedly claimed that while the strategic plan was the correct approach for long-term potential, the Company was unlikely to recognize the full financial benefit of such plan for several years and no assurance could be given

---

[8] BDT has partnered with JAB on a variety of acquisitions including Peet's Coffee & Tea, Caribou Coffee, and Einstein Bros. Bagels.

Case 1:16-cv-00612-WO-LPA   Document 1   Filed 06/13/16   Page 18 of 40

that such benefit would ultimately be obtained. At this same meeting, Krispy Kreme's attorneys review the terms of the merger agreement being negotiated with JAB, including JAB's insistence that there not be a "go-shop" provision in the merger agreement because it was opposed to a multi-party process and threatened to withdraw its offer if the Board engaged in one. The Board rejected JAB's $19.50 proposal, but agreed to reconvene on May 5, 2016 if JAB made a higher proposal to acquire the Company. Proxy 33.

59.     On May 4, 2016, JAB verbally proposed to Morgan, to acquire the Company at $20.50 per share in exchange for the Company agreeing to a customary "no-shop" provision and a termination fee of $50 million. Proxy 34.

60.     The Board discussed this verbal proposal on May 5, 2016 via a telephonic meeting and agreed that it would agree to the $20.50 offer if JAB agreed to a "go shop" provision, and otherwise to seek an increase in the purchase price to $21.00 per Krispy Kreme share and the termination fee would be lowered $42 million. Morgan was tasked with conveying the Board's view. JAB agreed to the $21.00 per share and to a "no shop" provisions in the merger agreement, with a single-tier termination fee of $42 million. Proxy 34.

61.     The Board voted on May 7, 2016, to accept the terms of the JAB proposal made on May 4, 2016. *Id.*

**C.     The Proposed Transaction Undervalues Krispy Kreme Shares**

62.     The Merger Consideration offered to Krispy Kreme's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Krispy Kreme's common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings. The Proposed Transaction will deny Class members their right to fully share equitably

19

in the true value of the Company. Indeed, the benefits obtained by JAB through the Proposed Transaction outweigh those provided in the Merger Consideration. In the May 9, 2016 joint press release announcing the Proposed Transaction, JAB's Senior Partner, Peter Harf, recognized the great value it was obtaining from the Merger and expressly noted that Krispy Kreme was a brand with "significant growth prospects."

63. As described above, Wall Street Analysts also had forecasted significant growth and set stock price targets above the Merger Consideration. All of this is due to Krispy Kreme's demonstrated history of strong financial performance and significant upward potential moving forward.

64. Thus, on March 22, 2016, the Company released is 2016 fourth quarter and end-of-year results.[9] For the fourth quarter fiscal 2016, (i) revenues increased 4.0% to $130.4 million from $125.4 million; (ii) system wide domestic same store sales rose 1.6%, including a 0.2% gain at Company shops; constant currency international franchise same store sales declined 7.1%; (iii) operating income rose 12.1% to $10.7 million from $9.6 million including impairment charges and lease termination costs of $4.4 million in the fourth quarter of fiscal 2016 and $0.9 million in the prior year quarter; (iv) net income was $8.2 million ($0.13 per share) compared to $6.5 million ($0.10 per share) in the fourth quarter last year; (v) adjusted earnings per share rose to $0.22 per share from $0.17 per share; adjusted net income and adjusted earnings per share are non-GAAP measures (see the reconciliation of GAAP to adjusted earnings accompanying this release).

---

[9] http://investor.krispykreme.com/press-releases/press-release-details/2016/Krispy-Kreme-Doughnuts-Inc-Reports-Financial-Results-for-the-Fourth-Quarter-and-Fiscal-Year-Ended-January-31-2016/default.aspx

65.     The fiscal 2016 highlights included the following: (i) revenues increased 5.8% to $518.7 million from $490.3 million; (ii) systemwide domestic same store sales rose 3.9%, including a 2.4% gain at Company shops; constant currency international franchise same store sales declined 3.9%; (iii) systemwide store count rose 13.6% during the year to 1,121 Company and franchise shops worldwide; (iv) operating income rose 8.0% to $52.1 million from $48.2 million including impairment charges and lease termination costs of $4.7 million in the current year compared to$1.0 million in the prior year; (v) net income was $32.4 million ($0.48 per share) compared to $30.1 million ($0.44 per share) last year; (vi) adjusted earnings per share rose to $0.80 per share from $0.70 per share last year; (vii) cash provided by operating activities was $78.9 million compared to $62.9 million in fiscal 2015; and (ix) the Company repurchased 2.8 million shares of its common stock under the Board of Directors' approved authorization for a total cost of $50.0 million.

66.     The Individual Defendant Thompson stated:

We are pleased with continued growth of the Krispy Kreme brand throughout fiscal 2016. During the year, we increased total revenue by almost 6%, adjusted earnings per share by 14%, operating cash flow by 26% and expanded our worldwide store count by 14% to over 1,100 stores. Systemwide domestic same store sales also rose nearly 4% as we had our seventh consecutive year of positive same store sales at Company stores. We thank our entire team and our franchise partners for their contributions to our ongoing success... .

We believe fiscal 2017 will be another year of **sustainable growth** as we partner with new and existing franchisees to spread the joy of Krispy Kreme throughout the world. As part of these efforts, we are refining our retail store model to deliver better returns while executing on our four key business drivers: accelerating global growth; leveraging technology; enhancing our core menu; and maximizing brand awareness. We remain excited about our brand's long-term potential and believe we are well positioned to drive earnings and cash flow growth in the future. We also plan to continue returning a significant portion of our excess cash flow to shareholders via on-going share repurchases. (emphasis added).

21

67.    The Company's press release announcing these results also provided: "In recognition of the Company's continuing ability to generate cash flow in excess of its current business needs, the Board of Directors increased the Company's share repurchase authorization by $100 million in March 2016 from $155 million to $255 million. With this increase, the Company has current authorization to repurchase an additional $143.4 million worth of shares."

68.    The Company also announced its fiscal 2017 guidance of adjusted earnings per share of $0.87 to $0.91 per share, compared to $0.80 per share in fiscal 2016 (on a GAAP basis, the Company projected earnings per share of $0.54 to $0.58 per share compared to $0.48 per share in fiscal 2016). This 2017 guidance was based among other things on the following: (i) approximately 30 new domestic shops including 10 Company shops; (ii) approximately 120 to 140 net new international franchise shops; (iii) capital expenditures of approximately $30 million; (iii) continued growth in systemwide domestic same store sales; (iv) relatively flat agricultural commodity and lower fuel costs compared to fiscal 2016, largely offset by increased store level labor and incentive costs. *Id.*

69.    On May 31, 2016, the Company announced results for first quarter fiscal 2017 as follows: (i) revenues increased 3.0% to $136.5 million from $132.5 million; (ii) Domestic system wide same store sales rose 0.7%, including a 0.7% decrease at Company Stores and 1.6% increase at domestic franchise stores; (iii) Systemwide store count rose 13.0% from the first quarter of last year to 1,133 shops worldwide; (iv) adjusted earnings per share rose to $0.25 per share from $0.24 in the first quarter last year; (v) cash provided by operating activities was $19.5 million compared to $17.1 million in the first quarter last year; and (vi) the Company repurchased 2.4 million shares of its common stock for a total cost of $39.6 million under the authorization approved by the Board of Directors.

**D.**     **The Preclusive Deal Protection Devices**

70.     Despite Krispy Kreme's prospects for future profitability and growth, and analysts' estimates of future stock price targets in excess of the Merger Consideration, Defendants targeted the sale of the Company only to JAB and agreed to onerous deal provisions and other agreements to ensure a sale only to JAB.   These onerous and preclusive deal protection devices operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

71.     The Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations.  The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations.

72.     Specifically, Section 6.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by JAB.  The Company also must terminate any and all prior or existing discussions with other potential suitors. Section 6.3(e).

73.     Additionally, Section 6.3(c) and (f) of the Merger Agreement grants JAB recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three (3) business days to negotiate with Krispy Kreme, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.  Section

6.3(f) requires the Company to notify JAB within 24 hours that it has received an inquiry, proposal or offer. To further suppress any efforts by potential bidders to even reach out to the Company, section 6.3(e) prohibits the Company from releasing any third parties from any existing standstill and/or confidentiality commitments.

74.     To further ensure the success of the Proposed Transaction, the Board locked up the deal by agreeing to pay a termination fee of $42 million. Section 8.5(b). The terms of the Merger Agreement essentially requires that the alternative bidder agree to pay a naked premium for the right to provide Krispy Kreme shareholders with a superior offer.

75.     These provisions cumulatively discourage bidders from making a competing bid for the Company.

## E.     The Incomplete & Materially Misleading Proxy

76.     On May 31, 2016, Krispy Kreme filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy fails to provide the Company's shareholders with material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed by Wells Fargo. As a result of the incomplete and misleading Proxy, Krispy Kreme shareholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

### Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction.

77.     The Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement. In particular, the

*Background of the Merger* and *Reasons for the Merger and Recommendation of the Board of Directors* sections contained on pages 27-38 of the Proxy is materially deficient in that it fails to disclose the following information:

(a)  The rational for the Board to allow Morgan to be the primary negotiator with JAB and not create a special Board committee, when Morgan may have been conflicted in negotiating with JAB due to the monetary benefits he would obtain from a transaction with JAB (Proxy 27-32)

(b)  The basis that JAB gave to Morgan and/or other Krispy Kreme representatives for an acquisition of the Company in November 2016 at $18.75 (Proxy 28);

(c)  The Company's valuation that was discussed at the November 23, 2015 Board meeting and the basis for that valuation (Proxy 28);

(d)  The basis on which the Board concluded that JAB's acquisition of Keurig Green Mountain in December 2015 would not interfere with the JAB acquisition of Krispy Kreme (Proxy 28);

(e)  The rational for engaging Wells Fargo as the Company's financial advisor;

(f)  Detailed explanation of the steps that Wells Fargo undertakes to determine whether a conflict exists that would preclude it from rendering an objective fairness opinion to the Krispy Kreme Board directors, including but not limited to relationships that have existed with JAB in the last two years;

25

(g)    The Company's long-term outlook, including projected GAAP ("Generally Accepted Accounting Protocols") and non-GAAP financial metrics that were discussed, presented to and/or considered by the Board and the basis for the Board's belief that the Company would be more successful transitioning to more of a franchise-based system that were discussed at the December 15-16, 2015 Board meeting (Proxy 29) and the March 16, 2016 Board meeting (Proxy 30);

(h)    The Company's potential short- and long-term financial impacts of the Company's base strategic initiatives, the challenging near-to-intermediate-term operating environment for the Company's strategy to shift toward a more franchise-based business model, the resulting increased refranchising in the upcoming years related to shrinking of the Company store footprint, the impact on earnings growth and earnings predictability, and the impact of such a strategy on earnings before interest, taxes, depreciation, and amortization ("EBITDA") and other financial metrics that were presented, discussed and/or considered by the Board at the March 15, 2016 Board meeting (Proxy 30) and subsequent Board meetings and whether the Company's projected performance metrics were updated and the manner in which they were updated for subsequent presentations to the Board;

(i)    The near term operational and financial risks associated with such a strategy to transition to a more franchise-based model and the inherent challenges with respect to operating an interrelated retail shop and consumer packaged goods platform (Proxy 30);.

(j)    The basis for Wells Fargo to claim at Board meetings (including the December 15-16, 2015 Board meeting) that (i) there were a limited number of potential strategic buyers in the quick service restaurant industry, (ii) that there had been a limited number of strategic mergers and acquisitions in the industry in recent years and that there had been a limited number of mergers and acquisitions in the quick service restaurant industry in recent years with transaction values in excess of $1 billion (Proxy 29);

(k)    Which financial models Wells Fargo relied on to claim to the Board that it was unlikely that a financial buyer would be interested in making a fully financed, non-contingent offer to acquire the Company at a price per share greater than the proposals that JAB made, starting with the $18.75 proposal discussed at the December 15-16, 2015 Board meeting (Proxy 29);

(l)    The rational and basis for the Board not to investigate other potential bidders for the Company, even after it had rejected JAB's initial proposal of $18.75 (Proxy 29);

(m)    The basis and/or rational for the Board's failure to engage the private equity firm about a potential transaction that contacted Thompson in January and February 2016 (Proxy30);

(n)    The JAB affiliate with which Krispy Kreme entered a confidentiality agreement on April 18, 2016 (Proxy32);

(o)    The internal Company financial information that was made available to JAB to conduct due diligence (Proxy 32);

(p)    The basis on which Krispy Kreme's management concluded at the May 3, 2016 Board meeting that the long-term strategic plan with respect to the Company was likely to negatively impact cash flow growth in the near term and quantification or some measure of this near-term cash flow impact (Proxy 33);

(q)    The Board's basis for agreeing to a "no-shop" provision in the Merger Agreement rather than seeking to have a "go-shop" provision (Proxy 34); and

(r)    What is meant when the Board provided in the Proxy that the Company is in the process of refining its new store performance and the risks associated with transitioning to a more franchise-based model (Proxy 37); and

(s)    All engagements, work performed for (and fees earned) and/or equity holdings in (i) the Company, and/or (ii) JAB (and any and all affiliates and/or subsidiaries), and/or (iii) BDT Capital.

28

78.     The omission of the above information renders statements in the Proxy "Background of the Merger" and "Reasons for the Merger and Recommendation of the Board of Directors" sections false and/or materially misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Propose Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange their shares are thus threatened with irreparable harm warranting the injunctive relief sought herein.

### Materially Incomplete and Misleading Disclosures Concerning Krispy Kreme's Financial Information and Banker Analysis

79.     The Proxy fails to properly and adequately disclose Krispy Kreme's non-public projected financial data and/or assumptions relating to the Company's future performance. The Proxy makes clear, that both the Board and Wells Fargo relied continuously throughout the sales process on this information to reach a decision to enter into the Merger Agreement with JAB and that the Board relied on this information to recommend that Krispy Kreme shareholders vote in favor of the Proposed Transaction for the Merger Consideration. The omission of this information renders the Proxy false and/or misleading as this information was relied on and utilized by the Board and Wells Fargo. This omission renders the Proxy false and/or misleading as this information was relied on and utilized by the Board and Wells Fargo.

80.     The section of the Proxy entitled "Reasons for the Merger and Recommendation of the Board of Directors," discloses the Board's bases for and/or information relied on to recommend that shareholders vote in favor of the Proposed Transaction, including the following: (i) the Company's business and operations, strategy, its current and historical financial condition and results of operations, and business plan and **projected performance**;; (ii) the perceived challenges and risks of **continuing as a stand-alone** public company; and the assessment that no other

29

internally developed alternatives were reasonably likely in the near term to create greater value for the Company's shareholders than the merger, taking into account business, competitive, industry, and market risks; (iii) the Company's **short-term and long-term financial projections** and the risks associated with the Company's ability to meet such projections, including the challenging near-to-intermediate-term operating environment for the Company's strategy to shift toward a more franchise-based business model, the potential cash flow and earnings impacts that may be experienced by the Company in executing such strategy, and other risks and uncertainties described in the Company's SEC filings; (iv) the Board's belief that the Company is unlikely to achieve a sustainable trading price for its common stock in excess of the $21.00 per share merger consideration within the foreseeable future given the Company's high trading multiple compared to other quick service restaurants, **its projected near-term financial performance (including earnings and cash flow/EBITDA growth rates), and its ability to sustain its earnings and cash flow/EBITDA growth rates** and trading multiple; (v) the financial analysis reviewed by representatives of Wells Fargo Securities with the board at its meeting on May 7, 2016. Proxy 36-39.

81.     The Board's recommendation as reflected in the Proxy section entitled "Reasons for the Merger and Recommendation of the Board of Directors" is false and/or misleading because, as alleged above, the Board clearly utilized and/or relied on the Company's non-public data regarding its future performance to recommend that shareholders vote in favor of the Proposed Transaction, but the Proxy fails to disclose this information or the information that is disclosed is false and/or misleading. Absent the data on the Company's future performance, shareholders cannot to weigh and gauge the Board's recommendation. This material information must be disclosed to shareholders prior to any shareholder vote on the Proposed Transaction.

82.     The Company's financial projections which in part are non-GAAP metrics with numerous undisclosed unique company-specific adjustments, including revenues, earnings before interest, taxes , depreciation and amortization ("EBITDA"), income from operations ("EBIT"), net income and diluted earnings per share, cash flow from operations, capital expenditures and free cash flows for fiscal 2017 through 2023 are false and/or misleading because the management assumptions that were utilized to create these metrics including the following were not disclosed:

- domestic same-store sales and the consumer packaged goods business grow at a low, single-digit rate each year, and international, same-store sales continue to be negative, driven by the Company's development approach;

- modest operating margin expansion in each of the Company Shop, Domestic Franchise and International Franchise segments, while operating margins within the Supply Chain segment contract to the mid-teens over the next few years;

- the Company's net operating loss carryforward would be fully utilized by the end of fiscal year 2019;

- free cash flow plus the incurring of $280 million of additional indebtedness is utilized to repurchase a significant amount of the Company's outstanding shares of stock (Proxy 43); and

- with respect to the cash flows from operations, the Company's net operating losses that Defendants claim will be fully utilized as of the end of fiscal 2019, and the proceeds from the sales of 51 shops to franchisees that were excluded from cash flow calculations (Proxy 45).

83.     The failure to disclose these inputs and/or assumption, to explain reconciliation of GAAP and non-GAAP financial projected data for purposes of reporting the financial data in the

31

Proxy violates SEC regulatory mandates and policy and renders the Company projected financial data and Wells Fargo valuation analysis that utilized such data, false and/or misleading, and renders the Board's recommendation false and/or misleading. Further, the Proxy discloses that the Individual Defendants acted on and issued its recommendation for Krispy Kreme shareholders to vote in favor of the Proposed Transaction based on consultation with counsel, and therefore they were fully apprised of their legal and regulatory obligations to disclose and reconcile GAAP and non-GAAP projections and otherwise disclose Company forecasts in an accurate and non-misleading manner. Due to the failure accurately and appropriately to disclose the Company's financial forecasts as described above, the following is rendered false and/or misleading (Proxy at 44-45):

The financial projections resulted in the following estimates of the Company's future financial performance:

**Projections ($ in millions, except diluted earnings per share)**

| | Fiscal Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
| System-Wide New Shop Openings, Net [1] | 169 | 159 | 224 | 244 | 269 | 299 | 324 |
| Total Revenue [2] | $ 555.9 | $ 595.0 | $ 582.5 | $ 646.6 | $ 707.9 | $ 772.9 | $ 841.5 |
| EBIT [3] | $ 64.4 | $ 70.9 | $ 75.9 | $ 89.7 | $ 102.6 | $ 116.7 | $ 131.6 |
| EBITDA [3] | $ 82.2 | $ 89.6 | $ 90.0 | $ 103.6 | $ 116.8 | $ 131.4 | $ 146.8 |
| Net Income [3] | $ 37.5 | $ 40.7 | $ 42.4 | $ 49.7 | $ 56.8 | $ 64.6 | $ 72.8 |
| Diluted Earnings Per Share [3] | $ 0.59 | $ 0.71 | $ 0.86 | $ 1.12 | $ 1.36 | $ 1.63 | $ 1.91 |

(1) The vast majority of these shops are assumed to be alternative shop-type formats. These figures also assume five company shop openings per year in fiscal years 2018 through 2023.

(2) The decrease in fiscal 2019 is a result of the assumed sale of 51 currently Company-owned shops to franchisees. It is assumed that the Company will retain the CPG (Consumer Packaged Goods) portion in the case of any dual-channel shops.

(3) Financial information has been prepared on a basis consistent with our historical GAAP financial statements, except for the fact that EBIT, EBITDA, Net Income, and Diluted Earnings Per Share for fiscal year 2019 exclude the effect of any potential one-time gain in conjunction with the sale of shops to franchisees.

EBITDA is a non-GAAP financial measure. Non-GAAP financial measures are not calculated in accordance with, and are not a substitute for financial measures calculated in accordance with, GAAP and may be different from non-GAAP financial measures used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures, in that they exclude a variety of charges and credits that are required to be included in a GAAP presentation.

**Cash Flow Information ($ in millions)**

| | | Fiscal Year | | | | | |
|---|---|---|---|---|---|---|---|
| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
| **Cash Flow from Operations** [(1)] | $ 85. 1 | $ 89. 5 | $ 52. 1 | $ 74. 2 | $ 81. 7 | $ 90. 2 | $ 99. 0 |
| **Capital Expenditures** | $ 37. 0 | $ 24. 9 | $ 22. 2 | $ 21. 4 | $ 21. 6 | $ 21. 8 | $ 22. 0 |
| **Free Cash Flow** | $ 48. 1 | $ 64. 6 | $ 29. 9 | $ 52. 8 | $ 60. 1 | $ 68. 4 | $ 77. 0 |

Note: the above cash flow information excludes any proceeds received in conjunction with the selling of 51 shops to franchisees.

(1) The financial projections assume the Company's Net Operating Loss is fully utilized as of the end of fiscal year 2019.

84. The Proxy also discloses that Wells Fargo reviewed the same false and/or misleading financial projections described above creating certain valuations used to render its fairness opinion including the following: (i) certain business and financial information relating to the business, operations, financial condition and prospects of the Company, including **financial forecasts, projections and estimates relating to the future financial performance of the Company as prepared by and provided to Wells Fargo Securities by the management of the Company for the fiscal years ending 2017 through 2023** (which we refer to as the "financial projections").

33

85.     However, the above emphasized information is not accurately and/or properly disclosed including in accordance with SEC Regulation G.  The failure to properly and accurately disclose this information renders Proxy false and/or misleading.  Without this information, Krispy Kreme shareholders cannot properly determine the projected financial information utilized by Wells Fargo in its analysis, which undermines the credibility of the Wells Fargo fairness opinion and renders the content and substance of said fairness opinion false and/or misleading, and negatively impacts stockholders' ability to weigh and measure the Wells Fargo fairness opinion.

86.     The failure to disclose the information in ¶¶83-85 above reflecting Krispy Kreme's projected future performance metrics also specifically renders the Proxy false and/or misleading with respect to Wells Fargo's implied valuation reference range per share in its *Discounted Cash Flow Analysis* (p. 51).

87.     Wells Fargo's *Discounted Cash Flow Analysis* further is rendered false and or misleading because the Proxy fails to disclose of the inputs or assumption utilized to determine perpetuity growth rates ranging from 2.0% to 4.0% and discount rates ranging from 9.0% to 10.0%, including: (i) the identity, quantity, and source of the weighted average cost of capital ("WACC") assumptions utilized; (ii) the rational for utilizing discount rates of 9.0%-10.0%, and (ii) whether the perpetuity growth rates correspond to assumed terminal pricing multiples.

88.     With respect to Wells Fargo's *Selected Companies Analysis* (Proxy 49), the Proxy fails to disclose the observed company-by-company multiples and financial metrics examined by Wells Fargo, which renders the following false and/or misleading:

Enterprise Value /

| | Mean | Median | High | Low |
|---|---|---|---|---|
| CY 2016E EBITDA | 12.6x | 13.1x | 14.3x | 9.8x |
| CY 2017P EBITDA | 11.8x | 12.2x | 13.5x | 9.6x |
| CY 2016E EPS | 24.3x | 24.4x | 31.5x | 18.4x |
| CY 2017P EPS | 21.4x | 21.1x | 26.9x | 16.9x |

34

Taking into account the results of the selected companies analysis, Wells Fargo Securities applied a multiple range of 12.0x to 14.0x based on the CY 2016E EBITDA multiples for the selected companies to the Company's estimated EBITDA for the fiscal year ending January 31, 2017, or "FY 2017E EBITDA"; a multiple range of 11.0x to 13.0x based on the CY 2017P EBITDA multiples for the selected companies to the Company's projected EBITDA for the fiscal year ending January 31, 2018, or "FY 2018P EBITDA"; a multiple range of 25.0x to 30.0x based on the CY 2016E EPS multiples for the selected companies to the Company's estimated earnings per share for the fiscal year ending January 31, 2017, or "FY 2017E EPS"; and a multiple range of 20.0x to 25.0x based on the CY 2017P EPS multiples for the selected companies to the Company's projected earnings per share for the fiscal year ending January 31, 2018, or "FY 2018P EPS." The selected companies analysis indicated implied valuation reference ranges per share of $15.61 to $18.15 based on the Company's FY 2017E EBITDA, $15.59 to $18.36 based on the Company's FY 2018P EBITDA, $14.79 to $17.73 based on the Company's FY 2017E EPS, and $14.34 to $17.89 based on the Company's FY 2018P EPS, as compared to the proposed merger consideration in the merger pursuant to the merger agreement of $21.00 per share.

89.     With respect to Wells Fargo's *Selected Transactions Analysis* (Proxy 50-51), the Proxy fails to disclose (i) the observed transaction-by-transaction enterprise values and (ii) financial metrics; and (b) whether other multiples and/or transaction premiums were examined (if so, they should be disclosed). The failure to make the aforementioned disclosures renders the following false and/or misleading:

Enterprise Value/

|  | Mean | Median | High | Low |
| --- | --- | --- | --- | --- |
| LTM Adjusted EBITDA | 11.1x | 8.9x | 21.3x | 6.5x |

Taking into account the results of the selected transactions analysis, Wells Fargo Securities applied a multiple range of 11.5x to 15.5x based on the LTM Adjusted EBITDA multiples for the target companies in the selected transactions to the Company's Adjusted FY 2016 EBITDA. The selected transactions analysis indicated an implied valuation reference range per share of $13.33 to $17.85, as compared to the proposed merger consideration in the merger pursuant to the merger agreement of $21.00.

90.     The Proxy is false or misleading due to the omissions identified above in paragraphs 79 through 89. In addition to violating the Federal Securities laws and SEC regulations regarding the use and/or emphasis of non-GAAP data, inputs assumptions and metrics without proper reconciliation with GAAP equivalents - which render such information misleading on its face - Company shareholders cannot evaluate for themselves whether the financial analyses performed by Wells Fargo were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the

35

Proposed Transaction. In other words, shareholders require this information in order to fully evaluate the extent to which Wells Fargo's opinions and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

**COUNT I**

**On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act**
**Against the Company and the Individual Defendants**

91.     Plaintiff repeats and realleges each allegation set forth herein.

92.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

93.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

94.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth *supra*. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

95.     The misrepresentations and omissions in the Proxy are material to Plaintiff who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

96.     Plaintiff and the members of the Class have no adequate remedy at law.

**Claims for Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

97.     Plaintiff repeats and realleges each allegation set forth herein.

98.     The Individual Defendants acted as controlling persons of Krispy Kreme within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Krispy Kreme, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

99.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

101.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy

purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

102. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

103. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

104. Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in their favor and in favor of the Class and against Defendants as follows:

A. Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representatives and his counsel as Class Counsel;

B. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Acquisition, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C. Rescinding, to the extent already implemented, the Acquisition or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  June 13, 2016                    Respectfully submitted,

/s/ Janet Ward Black
Janet Ward Black
NC State Bar 12869
Megan E. Kunz
NC State Bar 47874
Attorney for Plaintiff
Ward Black Law
208 W. Wendover Ave.
Greensboro, NC  27401
336-333-2244
jwblack@wardblacklaw.com
mkunz@wardblacklaw.com

*Attorneys for Plaintiff*

OF COUNSEL

FARUQI & FARUQI, LLP
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

MONTEVERDE & ASSOCIATES PC
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Ph. (212) 971-1341
Cell (305) 205-8284 or (646) 522-4840
email: jmonteverde@monteverdelaw.com

Attorneys for Plaintiff